**In re CITY OF FORT LAUDERDALE, FLA.**

No. 1664—M.

District Court, S. D. Florida,
Miami Division.

April 21, 1938.

230

George W. English, Jr., of Fort Lauderdale, Fla., for petitioner, City of Fort Lauderdale, Fla.

Chapman & Cutler, of Chicago, Ill., and Julian E. Ross, of Fort Lauderdale, Fla., for intervening petitioners Charles E. Harrington et al.

R. R. Saunders, of Fort Lauderdale, Fla., for intervening petitioner Broward County Port Authority.

Herbert S. Phillips, U. S. Atty., of Tampa, Fla., and Lloyd C. Hooks, Asst. U. S. Atty., of Miami, Fla., for intervening petitioner the United States.

Marshall B. Wood, of West Palm Beach, Fla., Chancey and Chancey, of Fort Lauderdale, Fla., W. Terry Gibson, of West Palm Beach, Fla., Robert F. Neafie, of Toledo, Ohio, in proper person, James W. Springsted, of Brooklyn, N. Y., in proper person, Fee & Liddon, of Fort Pierce, Fla., and Joseph Ginsberg, Daytona Beach, Fla., for objecting creditors.

LONG, District Judge.

This cause is before the court upon petition for composition of debts filed by the City of Fort Lauderdale, Fla.; upon the plan of composition attached to the petition; upon the intervening petition of the board of trustees representing bondholders; upon the intervening petition of the Broward County Port Authority; upon the intervening petition of the United States of America; upon objections, motions to dismiss, and answers of various creditors; and upon the petition of the board of trustees, attorneys, and agents claiming fees for services or expenses incident to the plan of composition of this proceeding.

It is conceded that the question necessary to decide is whether or not the amendment to the Bankruptcy Act, c. 10, §§ 81, 82, 83 and 84, 11 U.S.C.A. §§ 401 to 404, is constitutional.

The various objections to the constitutionality of the act are lack of uniformity, invasion of the sovereignty of, the state and its governmental agencies, impairment of contractual obligations, and the permitting of property to be taken without due process of law.

It appears from the petition that the City of Fort Lauderdale is a municipal corporation existing under chapter 10552, Laws of Florida, Special Acts of 1925 and amendatory acts; and that Broward County Port Authority is a body corporate and exists by virtue of chapter 17506, Laws of Florida, Special Acts of 1935, which has assumed the payment of the City of Fort Lauderdale bonds dated June 15, 1926, and known as Fort Lauderdale Harbor bonds; that the principal amount of outstanding bonds of the City of Fort Lauderdale, of the issue described in the plan of composition, amounts to $6,369,200; that the interest on said bonds represented both by coupons and interest, not represented by coupons, is $1,770,048.16; interest on past-due coupons $207,059.04; making a total of $8,347,207.20; that out of the total bonded debt there is now matured and due $3,021,008.20; that during the current taxing period an additional sum of $64,000 of principal will mature and an additional of $383,352 interest on bonds will become due; that of such amount of indebtedness the Broward County Port Authority is liable for the payment of harbor bonds in the amount of $2,279,483 principal and interest, of which amount the sum of $799,483 is past due, for which the City of Fort Lauderdale is primarily liable; that the assessed valuation of taxable property within the city limits of the City of Fort Lauderdale for the current fiscal year is $8,916,944 against which a tax of 24 mills on the dollar was levied to pay bond indebtedness, and 10 mills to pay operating costs; that, in order for the petitioner to pay its past-due and currently maturing indebtedness at this time, a levy would have to be made against the assessed valuation of 383 mills if 100 per cent. taxes were collected, and 630 mills on a 60 per cent. collection basis.

It is, therefore, the opinion of the court that the levy of this amount would be so exhaustive as to make it impossible to collect any substantial portion of such tax, either at the time the original petition was filed, or at this time, to pay the matured and maturing debts, and that petitioner is therefore within the meaning of section 83, clause (a), of chapter 10 of the act of Congress relating to bankruptcy, 11 U.S.C.A. § 403 (a).

The petitioner presents a plan of composition which provides that the in-

debtedness be refunded by the issuance of refunding bonds, the bonds issued to refund principal and to be dated January 1, 1936, and mature January 1, 1976; the bonds issued to refund harbor bonds of the issue of September 1, 1926, to be dated November 1, 1935, and mature November 1, 1970; the bonds issued to refund harbor bond principal to bear interest at the rate of 2 per cent. per annum for the first two years, 3 per cent. for the next three years, 3½ per cent. for the next three years, 4 per cent. for the next five years, 5 per cent. for the next seven years; bonds issued to refund other principal bonds (not harbor bonds) shall bear interest at the rate of 2 per cent. for the first five years, 3 per cent. for the next five years, 4 per cent. for the next five years, 5 per cent. for the next twenty-three years; and 6 per cent. for the last two years. Bonds shall be issued to refund interest in the amount equal to 25 per cent. of the face value of all interest coupons representing interest on said outstanding principal indebtedness plus interest accrued to January 1, 1936. All other interest shall be waived by the issuance of such refunding bonds.

Several creditors raised objections to the plans as designated between holders of coupons and holders of bonds, but the evidence discloses that in most cases the holders of bonds held coupons also, and only a very small minority held coupons alone. Without a complete refunding of the entire indebtedness at face value, it would not appear to the court that a fairer plan could be evolved.

It appears that this is the first case in which it has been undertaken to apply the act, as amended (the last act), to a municipality. There have been three cases before the court, all dealing with drainage districts. The majority opinion in the case of Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 896, 80 L.Ed. 1309, declaring the first act, Bankr. Act. §§ 78-80, as amended, 11 U.S.C.A. §§ 301-303, unconstitutional, held this Texas district to be a political subdivision in view of the fact that the district was created by a statute passed under section 52, article 3, of the Constitution of Texas, which permitted the creation of political divisions of the state with power to sue and to be sued, to issue bonds and to levy and collect taxes, but did not preclude bankruptcy legislation effecting taxing agencies as distinguished from political subdivisions of a state. Having in mind that under the Texas Constitution it was declared that the conservation and development of all natural resources of the state, including reclamation of lands and their preservation, were public rights and duties, and in view of the local Texas law, the majority of the Supreme Court held that this particular district was a political subdivision of the state of Texas created for the local exercise of her sovereign power.

In outlining the extent of the limitation on the federal power to pass bankruptcy legislation effecting a state, the court said: "If obligations of states or their political subdivisions may be subjected to the interference here attempted, they are no longer free to manage their own affairs; the will of Congress prevails over them; although inhibited, the right to tax might be less sinister."

And again in conclusion the court stated: "But for a very long time this court has steadfastly adhered to the doctrine that the taxing power of Congress does not extend to the states or their political subdivisions. The same basic reasoning which leads to that conclusion, we think, requires like limitation upon the power which springs from the bankruptcy clause."

From these statements of the law it would seem that only a political subdivision exercising sovereign powers and duties of the state was involved. It was more than a mere local taxing agency whose powers and activities were restricted for local purposes. It also would seem that it was the intention of the court to assert a limitation only on the federal power of bankruptcy legislation when the same would operate to interfere with the sovereign power of the state or one of its political subdivisions, and that there was no intention on the part of the court to include such prohibition against legislation where some minor taxing agency was concerned that of itself did not constitute a political subdivision of the state. Under the first act, which was declared unconstitutional, the act designated the instrumentalities included in its provisions as being "political subdivisions of the state." The holding of the court in its majority opinion was that it was beyond the power imposed on Congress under the

bankruptcy grant to pass an act which .would interfere with the state and the control of its fiscal affairs, and. that the act in question purporting to deal with political subdivisions of the state was an act of interference with its fiscal affairs.

In reviewing the history of the creation of the improvement district, its purposes and powers, the court concluded it was a political subdivision of the state. Attention is called to the fact in this connection that, whereas the original act applied to "any municipality or other political subdivision of any state," 11 U.S.C.A. § 303 (a), the new act enumerates the various bodies which may take advantage thereof, excluding counties. The phrase "political subdivision" does not appear in the new act.

■ From an examination of the decision of the United States Supreme Court regarding the nature of the bankrupt power, the court has said: "The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount." International Shoe Company v. Pinkus, 278 U.S. 261, 49 S.Ct. 108, 110,. 73 L.Ed. 318.

In the case of Billings v. United States, 232 U.S. 261, 34 S.Ct. 421, 424, 58 L.Ed. 596, the court, speaking through Mr. Justice White, said: "It is also settled beyond dispute that the Constitution is not self-destructive. In other words, that the powers which it confers on the one hand it does not immediately take away on the other."

Again the court, in Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island and Pacific Railroad Co., 294 U.S. p. 648, 55 S.Ct. 595, 603, 79 L.Ed. 1110, has said: "From the beginning, the tendency of legislation and of judicial interpretation has been uniformly .in the direction of progressive liberalization in respect of the operation of the bankruptcy power. * * * Taken altogether [the extensions of the bankruptcy power], they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous. growth of business and development of human activities from eighteen hundred to the present day. And these acts, far-reaching though they may be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed."

■ This expression by the higher court would indicate that the bankruptcy power is a broad one which should be exercised to meet new and changing conditions. In writing the dissenting opinion in the Ashton Case it would seem that Justice Cardozo had the thought in mind that the situation was one with which the states are helpless to deal. In the case of McCulloch v. State of Maryland, 4 Wheat. 316, 415, 4 L.Ed. 579, Chief Justice Marshall described the Constitution as one "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs."

Since the passage of the new act the District Court for the Southern District of California, in the Matter of Lindsay-Strathmore Irrigation District, 21 F.Supp. 129, 133, held the act unconstitutional. This is another drainage district case, and the court seemed to have based its ruling upon the assumption that the Supreme Court, in Ashton v. Cameron County Water Improvement District, supra, intended to apply the limitation on the bankruptcy power of Congress so as to restrict not only legislation effecting state and political subdivisions but also all taxing agencies.

In the opinion of District Judge Yankwich it is stated: "It is evident to me that the decision was not grounded upon the fact that the power of the Texas Legislature to establish water districts was derived from the general constitutional provision permitting the creation of political subdivisions of the state with power to sue and be sued, issue bonds, levy and collect taxes. The majority opinion intended to apply the limitation to all 'taxing agencies' which exercise, under the authority of the state, the attributes of sovereignty."

It would seem that, while thus recognizing that in the case before him he was not dealing with a political subdivision but a taxing agency which constituted a "public corporation for municipal purposes," he nevertheless felt that this type of corporation, as well as strict political subdivisions of a state, was intended by the majority opinion in the Ashton Case to be within the limitation against the congressional power to legislate on bankruptcy. It would seem that this holding was a misconstruction of the intention and effect

of the majority opinion in the Ashton Case.

It is also interesting to note the conclusion of Judge Yankwich's opinion in which he said: "As a student, exercising private judgment, I agree with the conclusion of the dissenters that immunity from interference through federal bankruptcy laws, even if applicable to states, should not be extended to state instrumentalities, whether they be municipal, quasi municipal, or public corporations. However, as a judge of a lower court, I cannot exercise private judgment, but must follow the opinion of the majority, which, as I read it, extends the immunity to all governmental agencies created by a state for the performance of public functions."

In the case of In re Drainage District No. 7 of Poinsett County, Arkansas, Luehrmann et al., Interveners, D.C., 21 F. Supp. 798, 804, District Judge Trimble held the new bankruptcy act constitutional, and in determining whether or not chapter 10 was in conflict with the decision in the Ashton Case said: "I deem it proper that effect be given as far as possible to the manifest intention of Congress in passing the new act, and for this purpose the hearings upon the several bills should be considered, and the report of the committee which was read before Congress as a foundation for the passage of the new act. In considering the hearings and discussion to be of value as a matter of interpretation, I act pursuant to authority of Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 [112 A.L.R. 1455], a decision rendered by the Supreme Court on March 29, 1937. That case interpreted and held constitutional the new Frazier-Lemke Act, 11 U.S.C.A. § 203(s), which was expressly intended by Congress to stand as a substitute for the original Frazier-Lemke Act, 48 Stat. 1289, which original act was held unconstitutional in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

"In the decision upon the new act the Supreme Court quoted at length from the hearings and discussion by the legislators in charge of the bill and applied a liberal interpretation to its provisions in order to hold that the new act was valid. The court declared that after full discussion Congress had concluded that the new bill re-enacted by it was free from the objectionable features which had been held fatal to the original act."

It appears from the report of the Judiciary Committee rendered in connection with the submission of the new bankruptcy act, that Congress interpreted the majority opinion in the Ashton Case as not precluding bankruptcy legislation effecting taxing agencies as distinguished from political subdivisions, and for that reason enacted the new law so as to apply only to a taxing district or agency which does not constitute a political subdivision of a state. This is shown by portions of the report of the committee as follows:

"The jurisdiction conferred in the bill terminates on June 30, 1940. One of the primary purposes of the measure is to enable, under proper safeguards, the rehabilitation and reorganization of those taxing districts and agencies which were in process of rearranging and refinancing their obligations under chapter 345 of the Public Acts of the Seventy-third Congress, sections 78, 79 and 80 (48 Stat. 798, title 11 U.S.C. §§ 301, 302 and 303, as amended [11 U.S.C.A. §§ 301–303]), when the United States Supreme Court declared that act unconstitutional in the case of Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L. Ed. 1309. However, any insolvent taxing district or agency may apply for composition under the provisions of this bill, and the need for the legislation is clearly shown by the testimony presented at the hearings.

"The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted. The taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation. No involuntary. proceedings are allowable, and no control or jurisdiction over that property and those revenues of the petitioning agency necessary for essential governmental purposes is conferred by the bill.

"As the statute which was declared unconstitutional was held to be within the subject of bankruptcies and uniform in its application, a fortiori, the present bill is adequately related to the general subject of bankruptcies, and does not conflict with

the fifth amendment of the Federal Constitution as to due process of law. Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L. Ed. 1309; Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

"This bill is intended to remove an apparent impasse, and the committee believes that it will be welcomed by debtors and creditors. When a municipality or a taxing district is insolvent, the creditors cannot foreclose their mortgage, or cause public property to be sold and the proceeds distributed. They must look to the exercise of the taxing power over a period of years, or, in cooperation with the debtor district, must grant extensions. This often involves reorganization of part or all of the debt structure, and hinges upon agreement by debtor and creditor, or on the existence of a Federal statute which may force recalcitrant minority creditors into agreement. Otherwise the creditors of a municipality or a taxing district must resort to mandamus proceedings, which have not been adequate remedies. In fact, the trend of recent decisions has been to deny the writ of mandamus wherever sound judicial discretion justifies denial. Hence, creditors have been unable to obtain unjust advantage, but the problem of the municipality or taxing district has remained unsolved. City of Asbury Park v. Christmas, 3 Cir., 78 F.2d 1003. For an embarrassed debtor without the remedy afforded by this bill, the only effective recourse is the repeal of its charter by the State legislature, in which event creditors are generally left without any remedy. Meriwether v. Garrett, 102 U.S. 472, 501, 26 L.Ed. 197."

█ It thus appears that, after full discussion and hearings, Congress concluded that the present statute was free from the objectionable features which had been fatal to the original act. The presumption in favor of constitutionality requires a ruling in favor of the validity of an act of Congress, and the removing of all doubts in favor of validity unless the contrary appears beyond a reasonable doubt, especially where such act has been passed to replace an act invalidated by the Supreme Court.

█ This case is distinguishable from the case of In re Lindsay-Strathmore Irrigation District, supra, in that the Irriga-

tion District of California was considered by the court to be a political subdivision or arm of the government under the law of California, while this case and its companion case, City of Hollywood, are municipalities, the City of Hollywood operating under a commission form of government, and the City of Fort Lauderdale operated under such a plan from 1925 to 1933. The Supreme Court of Florida has had occasion to pass upon the question and has defined municipalities in this state to be mere taxing agencies and has differentiated between a taxing agency and a political subdivision, which opinions are binding upon this court. In one instance the question arose as to whether a county, being a political subdivision of the state, could be sued in an action of tort arising from the collapse of a county bridge.

The court said: "While a county may, in some respects, resemble a municipality in that both organizations deal with public interests, their differences are so great that the cases discussing the latter's liability in damages for the negligent omission to perform a public duty are not analogous to those in which such a liability is sought to be imposed upon a county. The one feature which sufficiently distinguishes them is that the counties are under the Constitution political divisions of the state, municipalities are not. * * * The citizens of a municipality have a proprietary interest in the property and funds of the municipality; the citizens of a county have not. * * *

"A municipality is organized within certain limits of territory for the local advantage and convenience of the people in the particular locality." Keggin v. Hillsborough County, 71 Fla. 356, 71 So. 372, 373.

In the case of Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697, 698, 30 A.L.R. 471, involving a suit against the city to recover for injuries sustained by plaintiff from being struck by a fire engine, the defendant city was operating under a commission form of government, and the court said:

"The commission form of municipal government, while it is generally held by the courts to be valid, is said to be founded upon the idea that the administration of the affairs of a great city is more nearly analogous to the conduct of a business than to the government of a sovereign state. * * *

"While the drift of judicial thought, as tested by many decisions, seems to be toward the opinion that a city has no inherent right to local self-government and is a mere agency of the state to be governed and controlled by the Legislature even through its own agents or appointees, and that view finds some color in the language of our Constitution, which provides in section 8 of article 8 that the 'Legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time,' this court has consistently adhered to the doctrine of municipal liberty in the administration of local affairs.

"A municipality is organized within certain limits of territory for local advantage and convenience of the people in the particular locality. * * *

"The growth of municipal governments to the degree of perfection claimed by those who favor the commission plan is upon the theory that a city's functions have become more and more ministerial, in that its duties consist largely, if not entirely, in the management of public utilities such as waterworks and sewerage systems, electric lighting and power plants, gas plants, telephones, and street railways, all properties, not of the state, but of the people of the community or city, which are managed for the financial advantage and profit of the city. Courts upholding the constitutionality of such plans of municipal government do so upon the ground that the constitutional division of the powers of government into three departments, and forbidding persons belonging to or performing the functions of one department from exercising any powers appertaining to either of the others, does not apply to municipal corporations. See 1 Clute, Modern Municipal Charters, 224.

"It requires very little stretching of this doctrine to say: Therefore no municipal function is governmental, a city is not a political subdivision of the state, not a government but purely a business, commercial, proprietary management of local public interests."

Article 8 of the Constitution of the State of Florida recognizes the distinction between the corporate character of a municipality and a political subdivision of the state. Under section 1 of this article it is provided: "The State shall be divided into political divisions to be called counties," and in section 2 it is provided, "The several counties as they now exist are hereby recognized as the legal political divisions of the State."

In view of this holding by the Supreme Court of Florida, and further for the reason that I do not believe these municipalities to be political subdivisions of the state of Florida, I see no conflict in this holding with the Ashton Case.

For the reasons stated, the court holds chapter 10, amendatory to the Bankruptcy Act, 11 U.S.C.A. §§ 401–404, to be valid and constitutional as applied to Florida municipalities.

The decree of confirmation will, therefore, be entered and the motions to dismiss, demurrers and answers attacking the act as unconstitutional are overruled and denied, and exceptions granted to such ruling.

The act of the court, its opinion and findings, shall apply with equal force to the companion case, City of Hollywood.